## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KIMBERLY F. STRICKLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-3331 |
| | ) | |
| CAROLYN W. COLVIN,  Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Kimberly F. Strickland seeks review, pursuant to 42 U.S.C. § 405(g), of the administrative law judge's decision denying her application for disability insurance benefits.

Both parties seek summary judgment.

### I. INTRODUCTION

The Plaintiff filed an application for disability insurance benefits on November 8, 2011.  She alleged an onset date of August 10, 2011.  Her claim was denied initially and on reconsideration.  She requested a hearing which was held on May 1, 2013.  Administrative Law Judge Barbara J. Welsch issued a written decision on May 23, 2013, denying the claim.  The Appeals Council denied the Plaintiff's request for

review.  The Plaintiff now seeks judicial review.

## II. FACTUAL BACKGROUND

### A. Background and medical evidence

The Plaintiff was born on March 11, 1965.  She has a high school education and past work as a banquet waitress and optician.  She listed the following physical and mental conditions as affecting her ability to work: a back injury with fusion, bone spurs in the neck, arthritis, knee problems, heart arrhythmia, sleep apnea, depression and memory loss.

The Plaintiff's medical problems include moderate neuroforaminal stenosis in her cervical spine.  Her treating orthopedic surgeon, Per Freitag, M.D., on March 8, 2012 stated that Plaintiff had a degenerative disk disease in her lower back, demonstrated on a myelogram.  Although a previous SMG test was negative, he stated that this needed to be repeated.  On examination, she had "good strength of her upper extremities."

Despite surgical intervention on her right knee, the Plaintiff had continued limping and swelling after the surgery.  On January 9, 2012, Leo Ludwig, M.D., indicated that she had continued limping and swelling after the scope.  Studies showed grade 2 to grade 3 arthritis in the right knee.  Because she was not yet at grade 4, Dr. Ludwig did not recommend a total knee replacement.  Dr. Ludwig

observed that "she limps to get around," had trouble getting into her daughter's apartment because of the stairs and she had fallen trying to get up the stairs. He noted the presence of pain in her knee as well.

Dr. Freitag treated the Plaintiff's lower back problems. He noted a history of prior back fusion at L5/S1, with worsening problems. She developed instability of her lumbar spine with neurogenic claudication. He recommended another fusion up to the level of L3. At the time of surgery, Dr. Freitag noted "the instability was quite evident. In the standing position, the disk was significantly collapsed." Dr. Freitag had noticed medical signs of diminished sensation and weakened strength in her lower extremities. After the surgery, the Plaintiff continued to have difficulties. Dr. Freitag diagnosed clinical medical signs of a left L4 radiculopathy, commenting that she was fused from L3 to S1. She had a positive diskogram after the surgery, which showed degenerative disk disease with a concordant pain response at L4. The CT scan was positive for an annular tear at L4 and "at least mild canal and mild to moderate foraminal stenosis."

Dr. Freitag sent the Plaintiff to Edward Trudeau, M.D., for a new EMG test. Dr. Trudeau spent a considerable amount of time evaluating the Plaintiff and reviewed a number of detailed records sent by Dr. Freitag. Dr. Trudeau noted her history of two back surgeries and proceeded to conduct an examination, during which

he said the Plaintiff appeared to be in "a great deal of discomfort."  His examination disclosed positive medical signs of hypesthesia in the left thigh, weakness of the left hip flexors, the left quadriceps, the left ankle and left toes, and she had hypoactive left knee reflexes.  Dr. Trudeau then conducted detailed electromyographic studies which objectively demonstrated "moderately severe" left L4 radiculopathy and "moderate severe" left lateral femoral cutaneous neuropathy.

B. Hearing testimony

The Plaintiff testified that her medications caused memory loss.  She said her left leg was numb and she had a hard time walking.  The leg would give out and she would fall without warning.  She needed to lay down frequently and prop it up.

The Plaintiff reported that she did very little housework.  She could put a frozen dinner in the microwave; her daughter did the vacuuming; she could load the dishwasher but had to rest afterwards; she could not pull the wet laundry out of the washer and get it into the dryer, so her husband and mother helped with the laundry.  When grocery shopping, she used the "riding carts."  She had used a handicapped placard for her car and parking.  Most of her day was spent lying down and watching TV.  She used a computer but sitting at the computer increased pain so she was not using it frequently.  She used her phone while lying down or sitting on the couch for online access.  She reported difficulty with dressing, particularly with pants.  She had

4

given up gardening, yard work and mowing.  A 5-year old granddaughter stayed over every other week because her mother worked the night shift; the granddaughter's father took the child to school.  When together, the Plaintiff watched TV and colored with her granddaughter.

The Plaintiff testified that her first back fusion was 12 years earlier.  She had a total of five surgeries.  Dr. Freitag had recently told her she would probably need another surgery.  Because Dr. Freitag had his own medical issues, the Plaintiff had not seen him again.  She said Dr. Trudeau told her that the nerve damage was not repairable.  She had difficulty remembering where she had placed items, which she attributed to her medications.  She described difficulties with falling due to a lack of feeling in her left leg.  She had been using both a walker and cane for the six months prior to the hearing.  She mainly used the cane.

The Plaintiff described difficulties sitting.  She could only sit for about half an hour, then had to get up and walk around.  She would then get tired and have to sit back down; she called it a "vicious circle."  On good days, she preferred to lay down about every hour, but on a bad day, every 15 to 20 minutes.  Good days occurred once a week; she was able to do small house chores on that day.  On a bad day, she spent the day watching TV on the couch.

The Plaintiff testified Dr. Salvacion told her she needed the pain medications

because her back would always be painful.  The ALJ stated it sounded like "an unusual case."

A vocational expert testified that with a limitation to "light and sedentary work" with "minimal bending and stooping to perform the work, I mean as in the typical definition of minimal," with no climbing of ladders, ropes, scaffolds, stairs, or work at unprotected heights, the Plaintiff could still perform the optician job.  He said, though, that the optician job "would be mainly standing."  When the ALJ prompted him to talk about sitting, the vocational expert testified that "I have gone to opticians since I was 12" and there was a "significant amount of sitting at the job."  However, at least half of the job required standing.  If limited to sedentary work, he said the Plaintiff could be a checker, a telemarketer or a receptionist.  Unskilled work would include an envelope addresser, a survey worker or assembler.

For any of the jobs identified by the vocational expert, however, if an individual was off task because of distraction with pain and had difficulty with concentration because of pain medications for 20% of a work day, the person would not be able to maintain productivity.  If she missed work two or more days a month, none of the positions could be maintained.

The Plaintiff's mother testified that she had to help with the housework.  The Plaintiff was unable to move clothing from the washing machine and put it in the

dryer.  She did help with the folding but could not move the clothes from one place to another.  The Plaintiff's mother testified that Plaintiff often did not get up until noon and then would lay back down.   She spent almost all of some days mainly laying on the couch.  She had good days and bad days.  The Plaintiff's mother agreed that she had forgetfulness and memory problems.

C. ALJ's Decision

ALJ Welsch found that Plaintiff had not engaged in substantial gainful activity since the date she claimed she became disabled.  She found that Plaintiff had the following severe impairments: heart disease with pacemaker, coronary artery disease, headache, degenerative disc disease post lumbar and cervical surgeries, and degenerative joint disease (right knee arthroscopy, both knees, hips and feet).  The ALJ found that Plaintiff's depression was not a severe impairment.

At step three, the ALJ found "[t]he claimant has not demonstrated that her degenerative disc/joint disease meet or equal any Musculoskeletal Listing at 1:00 et seq including Listings 1.02 and/or 1.04.  See below evidence discussion." R. 23.  The ALJ assessed a residual functional capacity for sedentary work, "except because of possible spine pain exacerbation she is limited to minimal bending and stooping (as minimal is defined in the dictionary); no climbing ladders, ropes, scaffolds, stairs or work at unprotected heights due to joint and back pain and headaches and medication

side effects.  She is limited to no prolonged walking (no more than 10 minutes at a time) due to leg pain and weakness, and no work in temperature extremes due to heart problems and pain."  R. 24.  She ruled that Plaintiff was unable to perform any past relevant work, but could perform other work such as a checker, a telemarketer and receptionist.  She could also perform work as an envelope addresser or a survey worker.  Therefore, the ALJ found the Plaintiff was not disabled.

## III. DISCUSSION

### A. Standard of review

When, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner.  See Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010).  The Act specifies that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (citations omitted).  Although the Court's task is not to re-weigh evidence or substitute its judgment for that of the ALJ, the ALJ's decision "must provide enough discussion for [the Court] to afford [the Plaintiff] meaningful judicial review and assess the validity of the agency's ultimate conclusion." *Id*. at 856-57.  "[A]n ALJ is not required to provide a complete and

written evaluation of every piece of testimony and evidence, but must build a logical bridge from the evidence to his conclusion." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).

The Plaintiff contends that the ALJ's perfunctory analysis of Listing 1.04 requires reversal. She also alleges the ALJ did not properly evaluate Dr. Trudeau's opinion. The Commissioner claims that substantial evidence supports the ALJ's determination that the Plaintiff did not meet Listing 1.04. Additionally, the Plaintiff has failed to identify any reversible error in the ALJ's evaluation of Dr. Trudeau's opinion.

B. ALJ's analysis of Listing 1.04

Although an ALJ need not address every piece of record evidence, the United States Court of Appeals for the Seventh Circuit has held that "[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Minnick*, 775 F.3d at 935; *Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)); *see also Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

In *Kastner*, in considering whether the claimant met Listing 1.04(A), the ALJ stated that he "did not display limitation of motion of the spine as anticipated by

section 1.04A." *Id.* at 647. The claimant there argued that the ALJ ignored medical evidence that supported his argument that his range of motion of the spine was limited. *See id.* The Seventh Circuit found that the "ALJ's cursory analysis and disability determination were not supported by substantial evidence in the record." *Id.* The Plaintiff contends that the ALJ's decision here is as cursory. The ALJ here states, "The claimant has not demonstrated that her degenerative disc/joint disease meet or equal any Musculoskeletal Listing at 1.02 and/or 1.04. See below evidence discussion." R. 23.

The Plaintiff notes that the ALJ goes on to discuss some but not all of the medical evidence before finding that "[t]he medical evidence suggests that the claimant's back impairment improved after her fusion in September 2012." R.30-31. However, there is no further discussion of the requirements of Listing 1.04 or why the Plaintiff's evidence did not meet or equal its requirements.

The Commissioner states that ALJ's step five discussion here applied equally to the listings analysis and, in such circumstances, an alleged "perfunctory" listing analysis does not necessarily warrant remand. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five, we consider the ALJ's treatment

of the record evidence in support of both his conclusions at steps three and five.")
(internal citation omitted); *see also Buckhanon ex rel J.H. v. Astrue*, 368 Fed. App'x
674, 678 (7th Cir. 2010) (unpublished) (rejecting claimant's argument that decision
should be overturned because evidence of impairments was discussed separately from
listings analysis because "[t]here is no requirement of such tidy packaging, however;
we read the ALJ's decision as a whole and with common sense."). The
Commissioner states that the ALJ referenced her later discussion of the evidence as
explanation for her finding that Plaintiff did not meet Listings 1.02 and 1.04.

Listing 1.04A requires compromise of a nerve root or spinal cord, as well as
"[e]vidence of nerve root compression, characterized by neuroanatomic distribution
of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or
reflex loss and, if there is involvement of the lower back, positive straight-leg raising
test." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04A. Listing 1.04C requires
compromise of a nerve root or spinal cord and a finding of "[l]umbar spinal stenosis
resulting in pseudoclaudication . . . manifested by chronic nonradicular pain and
weakness, and resulting in inability to ambulate effectively." 20 C.F.R. Pt. 404,
Subpt. P, App. 1, § 1.04C.

The Plaintiff contends that after the ALJ's perfunctory and conclusory
statement that she does not meet Listing 1.04, there is no further discussion of the

requirements of Listing 1.04 or why the Plaintiff's evidence does not meet or equal its requirements.

The Plaintiff alleges that Dr. Freitag and Dr. Trudeau determined that Plaintiff had not improved following surgery. She had even gotten worse. Before her back surgery Dr. Freitag noted that an EMG test in April 2012 "showed no specific nerve radiculopathy," but a diskogram showed concordant symptoms at L2/3. Her physical examination showed mild tenderness, decreased sensation in the left lower extremity, normal reflexes and muscle weakness. The Plaintiff asserts the ALJ's finding that she had improved after surgery in September 2012 is not supported.

After her surgery, the Plaintiff continued to suffer from severe pain. In January 2013, Dr. Trudeau observed that she had "a great deal of discomfort." Dr. Freitag had referred her to Dr. Trudeau because of her pain following surgery. Dr. Trudeau's clinical findings included: hypesthesia (i.e., abnormal sensation), hypoactive or diminished left knee reflex and muscle weakness of the left hip flexors, the left quadriceps, the left ankle and her left toes. Additionally, the EMG testing was now positive for moderately severe left L4 radiculopathy and moderately severe left lateral femoral cutaneous neuropathy. These findings were completely absent from her condition before back surgery.

The ALJ's summary of Dr. Trudeau's report and studies is as follows:

12

> On January 14, 2013, EMG and nerve conduction studies of both lower extremities revealed left L4 radiculopathy and left lateral femoral cutaneous neuropathy; however, there was no evidence of other radiculopathy, entrapment neuropathy or mononeuritis multiplex.

R.29.  The Plaintiff alleges the ALJ did not mention a number of positive medical signs noted by Dr. Trudeau during his clinical examination that correlated precisely with his objective studies.  The Plaintiff testified that Dr. Freitag told her the level above her old fusion was affected and might need surgery, which she asserts correlates with L4–the level noted by Dr. Trudeau to be involved with the objectively defined radiculopathy.  The ALJ curiously notes the lack of any other radiculopathies, as if the lack of another form of neuropathy would render her moderately severe L4 radiculopathy and moderately severe cutaneous neuropathy an "improvement" over her condition before the surgery.

The Commissioner alleges that even if the ALJ ignored the aforementioned evidence, that alone does not establish that Plaintiff's impairments met a listing.  The Commissioner cites evidence which supports the ALJ finding, including that on December 9, 2012, the Plaintiff tested negative on straight leg raising; on January 3, 2013, she had a non-tender back and full range of motion throughout her musculoskeletal system; and on February 13, 2013, the Plaintiff had full motor strength in both the upper and lower extremities, and intact hand grasp bilaterally.

In *Ribaudo*, the Seventh Circuit was troubled by the ALJ's failure to mention the listing and his cursory, two-sentence finding and failure to evaluate any evidence favorable to the claimant.  *See Ribaudo*, 458 F.3d at 583.  Here, although the ALJ mentions the listing, the ALJ does not address certain evidence that is favorable to the Plaintiff and correlates with a Listing 1.04 impairment.  The ALJ says little about Dr. Trudeau's relatively lengthy report and appears to minimize evidence favorable to the Plaintiff.    She does not acknowledge Dr. Trudeau defined the Plaintiff's radiculopathy and neuropathy as "moderately severe."  The ALJ instead emphasizes that no other neuropathies were demonstrated.

The ALJ cites a few examples which might suggest the Plaintiff improved after surgery, while largely ignoring evidence from Dr. Trudeau which would support the opposite conclusion.  Because there is objective medical evidence that the ALJ does not address which supports a finding that is inconsistent with the ALJ's conclusion, the Court cannot properly review the ALJ's decision with respect to Listing 1.04. The Court is unable to conclude that the ALJ's analysis at Step 3 is supported by substantial evidence.

Ergo, the Plaintiff's Motion for Summary Judgment [d/e 11] is ALLOWED.

The Defendant's Motion for Summary Judgment [d/e 14] is DENIED.

The Commissioner's Decision is Reversed and the action is REMANDED.

14

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Clerk shall enter a Judgment.  This action is remanded to the Commissioner of Social Security for further proceedings.

ENTER: April 5, 2017

FOR THE COURT:

 /s/ *Richard Mills*
Richard Mills
United States District Judge